**GREENPEACE USA, a California non-profit corporation; Stichting Greenpeace Council, sometimes known as Greenpeace International, a not-for-profit stichting incorporated in the Netherlands; Institute For the Advancement of Hawaiian Affairs, a Hawaii non-profit corporation; World Council of Indigenous Peoples—Hawaii, a Hawaii non-profit corporation; and Walter Keli Iokekai Paulo, an individual, Plaintiffs,**

v.

**Michael P. STONE, Secretary of The Army; Richard Cheney, Secretary of The Department of Defense, Defendants.**

Civ. No. 90–00588 DAE.

United States District Court,
D. Hawaii.

Sept. 28, 1990.

751

Paul P. Spaulding, III, Arnold L. Lum, Sierra Club Legal Defense Fund, Inc., Honolulu, Hawaii, Denise E. Antolini, Northwest Office of the Sierra Club Legal Defense Fund, Seattle, Wash., Jon M. Van Dyke, Honolulu, Hawaii, for plaintiffs.

Daniel A. Bent, U.S. Atty., Theodore G. Meeker, Asst. U.S. Atty., Honolulu, Hawaii, Charles W. Findlay, II, Carol Annette Petsonk, Michael J. Malmquist, David Jones, U.S. Dept. of Justice, Environmental & Natural Resources Div., Washington, D.C., for defendants.

## AMENDED ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DAVID A. EZRA, District Judge.

Plaintiffs' motion for preliminary injunction came on for hearing before this court on August 20, 1990. The court, having carefully reviewed the pleadings in this matter, having heard the oral arguments of counsel and being fully advised as to the premises herein, DENIES plaintiffs' motion.

1. The munitions consist of 8-inch and 155-millimeter projectiles containing the nerve agents GB and VX.

2. Pub.L. 99–145, codified, 50 U.S.C. § 1521(a)(1), provides as follows:
Notwithstanding any other provision of law the Secretary of Defense ... shall, in accordance with the provisions of this section, carry out the destruction of the United States' stockpile of lethal chemical agents and munitions

## I. BACKGROUND

This action arises out of the United States Army's transportation and proposed destruction of approximately 100,000 rounds of nerve gas[1] which have been stored in the Federal Republic of Germany ("FRG") since 1968. These munitions, sometimes referred to as the European stockpile, comprise less than 6% of the United States' unitary chemical munitions retaliatory stockpile.

In 1986, President Reagan entered into an agreement with Chancellor Kohl to remove these obsolete munitions from the FRG by December 1992. Congress has mandated that the entire United States stockpile of unitary chemical weapons be destroyed by April 30, 1997.[2] Department of Defense Authorization Act of 1986, Pub.L. No. 99–145, § 1412(a), 99 Stat. 583, 747, as amended by Pub.L. No. 100–456, § 118(a), 102 Stat. 1918, 1934 (1988).

In March, 1989, at the request of President Bush, Secretary of State Baker agreed with Chancellor Kohl to accelerate the date for removal of the stockpile from 1992 to the end of 1990. See Declaration of James F. Dobbins, Jr.[3]

Accordingly, defendants, the United States Army and the Department of Defense, have undertaken a joint plan with the West German Army to remove these obsolete chemical weapons from their storage site in Clausen, Germany and transport them to Johnston Atoll for eventual disposal in the Johnston Atoll Chemical Agent Disposal System (hereinafter "JACADS").

Johnston Atoll is an unincorporated United States Territory located in the central Pacific Ocean approximately 800 miles southwest of Honolulu, Hawaii. Once des-

that exists on the date of the enactment of this Act.
Pub.L. 100–456 amended 50 U.S.C. § 1521(b) and set the date for completion, or "stockpile elimination deadline," as April 30, 1997.

3. Mr. Dobbins is the Principal Deputy Assistant Secretary for European and Canadian Affairs. From 1986 to 1989, he served as Deputy Chief of Mission at the United States Embassy in the Federal Republic of Germany.

ignated a Wildlife Refuge in 1940, it has been used for various military purposes since World War II and is presently under the authority of the United States Department of Defense.

In 1971, the United States removed its stockpile of chemical munitions from Okinawa (hereinafter the "Okinawa stockpile") at the request of the Japanese government and shipped it to Johnston Atoll for storage and eventual destruction. Johnston Atoll was chosen as a storage site because Congress passed Pub.L. 91–672 which specifically prohibited the Army from transporting the Okinawa stockpile to the continental United States. The JACADS facility was initially designed for the purpose of destroying these chemical munitions.

The JACADS facility is part of the Army's overall plan to destroy the entire United States unitary chemical weapon stockpile by 1997.[4] Congress has directed the Secretary of the Army to complete operational verification testing ("OVT") of the JACADS facility before beginning any "prove out" period at other proposed destruction facilities. Pub.L. No. 100–456. The Secretary also must notify Congress if that verification is not completed by December 31, 1990. *Id.* In addition, the Department of Defense Appropriations Act, 1990, Pub.L. No. 101–165, Title VI, 103 Stat. 1112, 1127, directs the Secretary of Defense to certify to Congress that the Johnston incineration facility has destroyed chemical munitions and that adequate storage facilities exist before moving the munitions stored in the FRG.

In accordance with this mandate, on July 22, 1990, the Army certified to Congress that it had destroyed live agent chemical munitions at the JACADS facility on June 30, 1990 and between July 14 and July 21, 1990 and that adequate storage exists to safely accommodate the European stockpile.

On July 26, 1990, the United States Army, together with the assistance of the West German Army, began moving the European stockpile from its storage site in Clausen. The munitions are first placed in secondary steel containers and then into special shipping containers called MILVANS. The MILVANS are then loaded onto trucks and then transported thirty miles via truck from Clausen to Miesau where they will be temporarily stored at a railhead. *See* Declaration of Major General Louis J. Delrosso. At the date of the hearing on plaintiffs' motion for preliminary injunction, this program for transportation was well underway.

Once all the munitions are at Miesau, they will be loaded onto railcars and transported to the port of Nordenham on the North Sea. The Director of the Chemical Retrograde Task Force, Major General Louis J. DelRosso ("DelRosso"), estimated that the stockpile would leave Miesau sometime after August 28, 1990. Once the munitions reach Nordenham by rail, the United States Army and West German Army will load the MILVANS into specially outfitted container ships to be transported by sea to Johnston Atoll. At the August 20, 1990 hearing on plaintiffs' motion, counsel for the defendants represented that the weapons would not leave the FRG until after September 10, 1990.

The Army has prepared three environmental impact statements ("EIS's") with respect to the storage and incineration facility at Johnston Atoll. In 1983, the Army published an EIS which addressed the construction and operation of the facilities designed to destroy the chemical weapons which were already stored on Johnston Atoll (the Okinawa stockpile). In 1988, the Army published a second EIS addressing the disposal of solid and liquid wastes which the JACADS project will produce. On July 23, 1990, the Army published a second supplemental EIS (hereinafter "SSEIS") which specifically addresses dis-

---

**4.** There are presently eight Army installations located in the continental United States (CONUS) which store 94% of the total United States' stockpile of unitary chemical weapons. Disposal facilities are proposed for each of these storage facilities. Only one site, however, at Tooele Army Depot in Utah, is under construction and completion is not expected until December 1992.

posal of the European stockpile at Johnston Atoll. The SSEIS addresses the impact of (1) the transportation of the chemical munitions from the edge of the territorial waters surrounding Johnston Atoll to a pier on the Atoll; (2) unloading the munitions at the JACADS facility; (3) storage of the munitions at the facility; and (4) the destruction of the munitions.

Pursuant to Executive Order 12114, the Army prepared a Global Commons Environmental Assessment (hereinafter "GCEA") which focuses on the shipment of the munitions from the North Sea port of Nordenham to the territorial waters extending 12 nautical miles from Johnston Atoll.[5] The Army has not yet determined the specific route between Germany and Johnston Atoll, however, the GCEA examines the environmental impact of the four potential sea routes. The Army concluded in its GCEA in March, 1990 that "[t]he expected normal operations would only cause the same environmental impacts as from the passage of any modern commercial ship." GCEA "Information Paper" (Public) at 4.

The instant action to halt the removal of the European stockpile follows a previous unsuccessful attempt by a group of West German citizens to enjoin movement of the munitions in the FRG. The transportation of the munitions through the FRG is being undertaken pursuant to an exceptional authorization issued by the Federal Minister of Transport pursuant to the German Regulation on Transportation of Hazardous Goods by Rail and the Regulation on Domestic and Cross–Frontier Road Transport of Hazardous Goods. On July 20, 1990, the Administrative Court of Cologne denied the German petitioners' request for a preliminary injunction and ruled that, in light of the extensive planned safety precautions, the proposed transport of chemical weapons through the FRG did not violate the German Basic Law. Translation of the De-

cision of the Administrative Court of Cologne, *Eric Neumayer, et al. v. FRG*, July 20, 1990. The German court examined the proposed safety measures and plan for transport and found that it complied with German law and the danger posed by the plan was tolerable and did not violate any German constitutional rights. *Id.* at 9–11.

On August 1, 1990, plaintiffs Greenpeace USA, Stichting Greenpeace Council, Institute for the Advancement of Hawaiian Affairs, World Council of Indigenous People and Walter Keli'iokekai Paulo filed a complaint for injunctive relief against Michael P. Stone, Secretary of the Army, and Richard Cheney, Secretary of the Department of Defense ("DOD"), to enjoin the movement of chemical munitions from the FRG to Johnston Atoll. Plaintiffs assert in their complaint that the U.S. Army and DOD have violated the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 ("NEPA") by, among other things, failing to prepare a comprehensive EIS statement covering all aspects of the transportation and disposal of the European stockpile. On August 3, 1990, plaintiffs filed an application for temporary restraining order.

On August 9, 1990, this court denied plaintiffs' application for a temporary restraining order to enjoin the defendants from transporting and removing the European stockpile from the FRG. The court found at that time the balance of hardships did not tip sharply in favor of plaintiffs, and furthermore, plaintiffs' claims based on the extraterritorial application of NEPA were not persuasive under the circumstances of this case. The court considered, among other things, the significant danger that halting the shipments already well underway would pose, as well as the serious disruption to foreign policy which might result from an application of NEPA to the United States Army's joint operation with the West German Army to remove the weapons from the FRG.

---

**5.** This document was classified by the Department of Defense as "Secret." Initially, the defendants did not release it to the public, but instead published an "Information Paper" on June 22, 1990 which outlines the factors considered and conclusions reached by the Army in the GCEA. On August 19, 1990, the GCEA was declassified and released to the court and to plaintiffs for purposes of this litigation. Limited portions of the document have been redacted, however, based on national security concerns.

In light of the pressing nature of plaintiffs' claims, the court set plaintiffs' motion for preliminary injunction for prompt hearing. Accordingly, plaintiffs now seek a preliminary injunction to halt shipment of the munitions which are presently being transported across Germany to the North Sea to be loaded onto ocean vessels for shipment to Johnston Atoll.

## II. STANDARD FOR GRANTING A PRELIMINARY INJUNCTION

An injunction is an equitable remedy and does not issue as a matter of course. *Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987) (rejecting the Ninth Circuit's holding that "irreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action"); *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 1802, 72 L.Ed.2d 91 (1982).

In order to obtain a preliminary injunction plaintiffs must show either:

(1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in its favor.

*U.S. v. Odessa Union Warehouse Co–Op,* 833 F.2d 172, 174 (9th Cir.1987).

These standards are not actually two separate tests, but rather "extremes of a single continuum." *Half Moon Bay Fishermans' Marketing v. Carlucci,* 857 F.2d 505, 507 (9th Cir.1988) (citations omitted).

'[T]he critical element in determining the test to be applied is the relative hardship to the parties. If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly.'

*Id.*

Also, in *Half Moon Bay Fishermans' Marketing,* the Ninth Circuit held that defendants' "minimal degree of compliance with the applicable statutes and regulations [NEPA] diminishes the plaintiffs' likelihood of success on the merits." *Id.*

Finally, the court must also consider the public consequences in determining whether to grant the extraordinary remedy of a preliminary injunction. *Weinberger,* 102 S.Ct. at 1803.

## III. THE MERITS

### A. *Standing*

■ First, to challenge an agency's action under § 10 of the Administrative Procedure Act (APA), 5 U.S.C. § 702, plaintiffs must allege that they are "adversely affected" by the agency's action and that their alleged injury falls within the "zone of interests" sought to be protected by the statute at issue. *National Wildlife Federation v. Burford,* 871 F.2d 849, 852 (9th Cir.1989).

■ It has long been recognized that individuals have standing under the APA, to challenge federal agency action which adversely impacts their aesthetic and recreational interests in use and enjoyment of natural resources. *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1973) ("particular environmental interests ... shared by the many rather than the few does not make them less deserving of legal protection through the judicial process").

■ A plaintiff, however, "must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973).

■ The Ninth Circuit has held that "procedural injury" is sufficient to establish "injury in fact" for purposes of challenging an agency's failure to prepare an environmental impact statement in violation of NEPA, provided that the injury is alleged by a plaintiff "having a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have." *Friends of the Earth v. U.S. Navy,* 841 F.2d 927,

932 (9th Cir.1988) *quoting City of Davis v. Coleman,* 521 F.2d 661, 671 (9th Cir.1975); see also *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 491 (9th Cir. 1987).

A recent decision of the United States Supreme Court, however, appears to indicate more restrictive requirements must be met to establish standing in NEPA cases. In *Lujan v. National Wildlife Federation,* — U.S. ——, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), the Supreme Court held that the National Wildlife Federation ("NWF") had failed to establish standing to challenge the Bureau of Land Management's "land withdrawal review program" under NEPA and the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1712 ("FLPMA"). The challenged Bureau of Land Management ("BLM") program involved 1,250 or so individual classification terminations and withdrawal revocations of federal lands some of which would result in opening up certain lands to private mining activities. *Id.,* 110 S.Ct. at 3184–85. To rebut defendant's motion for summary judgment on the issue of standing, NWF submitted affidavits of individual members who alleged that their recreational use and aesthetic enjoyment on federal lands "in the vicinity" of lands affected by the BLM action would be adversely affected. *Id.* at 3187–8. The Supreme Court held that, while the affidavits adequately alleged " 'adverse effect' or 'aggrievement' . . . [which] met the 'zone of interests' test" they failed to demonstrate that the interests of the individuals were "actually affected" by the specific agency actions challenged. *Id.* at 3187 (citations omitted).

While the *Lujan* holding appears to heighten the requirements for establishing actual injury for purposes of standing under NEPA, at this stage in these proceedings, the decision is not controlling. In *Lujan,* the Supreme Court specifically addressed the plaintiffs' failure to set forth "specific facts" which would raise genuine issues of material fact in order to oppose a motion for summary judgment. *Id.* at 3188. The motion before this court is not one seeking summary judgment and this court need not resolve whether material issues of fact have been raised, but rather whether plaintiffs' cause of action has a probability of success on the merits or whether substantial questions have been raised.

Nonetheless, even under the broad standard for establishing standing under NEPA in this circuit, there is some question whether plaintiffs have or can allege injury which would confer standing upon them to challenge the entirety of the federal action at issue. This case is unique in that the challenged federal action spans the globe from Germany to Johnston Atoll. The "geographical nexus" requirement discussed in Ninth Circuit law is difficult for plaintiffs to meet, especially for the transoceanic portion of the Army's action. *See Oregon Environmental Council,* 817 F.2d at 491; *City of Davis,* 521 F.2d at 671.

Plaintiff Walter Keli'iokekai Paulo asserts that he fishes in the vicinity of Johnston Atoll and will likely be affected by the JACADS project. The injury he alleges may confer standing on him to challenge storage of the munitions and operation of the JACADS project on Johnston Atoll, however, it would appear that he does not have standing to challenge the defendants' actions in West Germany or across international waters. *See id.*

Plaintiff Greenpeace International, however, claims members in the FRG and throughout the world [6] who allege injury as a result of the movement and transoceanic shipment of the chemical weapons from West Germany. Members of the plaintiff organization residing in the vicinity of the route used for transporting the stockpile from Clausen to Nordenham, Germany can likely satisfy the procedural injury and geographical nexus test, since they might be

---

**6.** Plaintiffs' verified complaint states that "[Greenpeace and Greenpeace International] has members in practically every country that borders an ocean on which these chemical weapons may travel." Complaint at ¶ 8. Plain- tiff groups also claim members who are "commercial fishermen who fish in the water surrounding Hawaii and near Johnston Atoll." *Id.* at ¶ 9.

expected to suffer the environmental or other consequences of any incident which might occur during the transportation of the stockpile across West Germany. It is impossible at this stage in the proceedings, however, to determine conclusively whether any of the plaintiffs or plaintiff members are geographically in the vicinity or potentially affected by the actual transoceanic shipment of the weapons in international waters since the route is undetermined at this time. In light of the Supreme Court's recent emphasis on *actual injury* in *Lujan v. NWF*, 110 S.Ct. 3177, and the Ninth Circuit's requirement of some geographical nexus to the federal action, there is a serious question as to whether plaintiffs have standing to challenge the transoceanic portion of the defendants' operation. *Friends of the Earth*, 841 F.2d at 932.

This issue alone, however, is not dispositive of plaintiffs' motion for preliminary injunction. The court must also consider whether substantial questions have been raised on the merits of plaintiffs' claims and whether the balance of hardships compels preliminary injunctive relief.

## B. *NEPA Claims*

Three of plaintiffs' five claims are based on NEPA. First, Greenpeace argues that the Army's segmentation of the removal operation into three separate portions for purposes of determining its environmental impact is improper and a comprehensive EIS covering the removal, transportation and incineration of the European stockpile should have been prepared.

Second, Greenpeace alleges that the Army has violated NEPA by failing to evaluate a full range of alternatives, including a "no action" alternative. Finally, Greenpeace claims that the Army violated NEPA and the Council of Environmental Quality ("CEQ") Regulations because it failed to consider important new information in its SSEIS.

 "NEPA is essentially a procedural statute." *Half Moon Bay Fisherman's Marketing*, 857 F.2d at 508 *quoting Oregon Environmental Council v. Kunzman*,

817 F.2d at 492 (citation omitted). As such, this court cannot set aside defendants' action unless it was undertaken without observing the statutory procedures or was "arbitrary, capricious, an abuse of discretion, or otherwise not according to law." *Id.*

 This court cannot "substitute its judgment for that of the agency concerning the wisdom of the proposed action." *Id.* Further, this court must follow a "rule of reason" to determine whether the EIS contains a reasonably thorough discussion of the environmental consequences. *Id.* This court cannot disturb the agency's decision if that agency has taken a "hard look" at the decision's environmental consequences. *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 2739 n. 21, 49 L.Ed.2d 576 (1976).

### 1. Failure to Prepare a Comprehensive Environmental Impact Statement

The crux of this issue, as discussed in this court's previous order denying temporary preliminary relief, is whether NEPA applies extraterritorially to the circumstances at hand. The court indicated preliminarily that it is not convinced NEPA applies extraterritorially to the movement of munitions in Germany or their transoceanic shipment to Johnston Atoll. The court reached this conclusion largely based on the political question and foreign policy implications which would necessarily result from such an application of a United States statute to joint actions taken on foreign soil based on an agreement made between the President and a foreign head of state. *See e.g. Natural Resources Defense Council, Inc. v. Nuclear Regulatory Comm'n*, 647 F.2d 1345, 1367 (D.C.Cir.1981) (hereinafter "*NRDC v. NRC*"). After further briefing and argument, the court's determination with respect to the application of NEPA remains unchanged.

#### a. *The President's Agreement*

Plaintiffs now dispute the actual existence of an agreement between President Bush, through Secretary of State Baker, and Chancellor Kohl which requires remov-

al of the munitions by December 1990.[7] Plaintiffs assert that the only "agreement" discussed in the Record of Decision issued July 12, 1990 is the 1986 agreement between President Reagan and Chancellor Kohl promising removal of the weapons by December 1992.[8] Plaintiffs also contend that the testimony given to the Senate Armed Services Committee on April 5, 1990 mentioned no "agreement" between the President and the Chancellor, but rather affirmed that the December 1990 target date was a result of President Bush's urging the Defense Department to accelerate removal.[9] *See* Statement by Mrs. Susan Livingstone, Assistant Secretary of the Army, before Subcommittee on Strategic Forces and Nuclear Deterrence, Committee on Armed Services, United States Senate, April 5, 1990.

Plaintiffs' argument is more semantic than substantive. Although a written document may not have been executed between President Bush and Chancellor Kohl, the evidence presented by the defendants clearly indicates that Secretary of State Baker, on behalf of President Bush, entered into an agreement with Chancellor Kohl that the European stockpile would be removed from the FRG by December, 1990. This promise was diplomatically sufficient enough to be relied upon by the Chancellor and communicated to both the West German legislature and the West German peo-ple. Accordingly, as this court indicated previously, this agreement and commitment by the President exercising his legitimate foreign policy powers must be accorded weight in considering whether NEPA applies under these circumstances. *See, e.g., Johnson v. Eisentrager,* 339 U.S. 763, 788–789, 70 S.Ct. 936, 948–949, 94 L.Ed. 1255 (1950); *Mitchell v. Laird,* 488 F.2d 611, 616 (D.C.Cir.1973); *Cranston v. Reagan,* 611 F.Supp. 247, 253 (D.D.C.1985).

b. *Application of NEPA to the Transportation of Munitions in Germany*

■ Having found for purposes of this motion that there exists a presidential commitment in the form of an agreement with Chancellor Kohl and the people of the FRG to remove the European stockpile from Germany by the end of 1990, the court next turns to whether NEPA requires the defendants to prepare a comprehensive EIS which evaluates the environmental impacts of the movement of those munitions within West Germany.

■ First, absent evidence of Congressional intent to the contrary, a federal statute should be construed as applying only within the territorial jurisdiction of the United States. *Foley Bros. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949); *McKeel v. Islamic Republic of Iran,* 722 F.2d 582 (9th Cir.1983); *Meredith v. U.S.,* 330 F.2d 9, 11 (9th Cir.1964); *Com-*

---

7. The existence of this agreement played an important part of this court's denial of plaintiffs' application for a temporary restraining order. It is an important consideration in determining whether defendants complied with NEPA under the specific facts of this case and therefore, plaintiffs strongly contest it.

8. The Record of Decision provides as follows:
 The proposed project to remove the U.S. chemical munitions currently stored within the FRG has as its genesis Public Law 99–145, as amended by Public Law 100–456, which requires the destruction of the unitary chemical stockpile except in the event that an adequate binary capability does not exist or the unitary weapons are needed in a national emergency of war. Former President Reagan and FRG Chancellor Kohl entered into an agreement in 1986 that required the United States to remove its munitions from the FRG by the end of 1992. Subsequently, President Bush requested the Defense Department to accelerate this schedule. In March 1990, a public announcement was made that *the U.S. and FRG had agreed to the removal of the chemical munitions by September 1990.* (Emphasis added.)

9. Assistant Secretary of the Army, Mrs. Susan Livingstone, stated to the Senate subcommittee as follows:
 During the 1986 Tokyo Economic Summit, former President Reagan and Chancellor Kohl reached an understanding that the chemical munitions would be removed from Germany by the end of 1992. Subsequently, at Chancellor Kohl's urging, President Bush encouraged the Department to accelerate the timetable for this retrograde project.

 . . . . .

 On March 8, 1990, most of the plans for the movement within the FRG were released in a press conference that was held at Pirmasens, Germany. . . .

*modity Futures Trading Comm'n v. Nahas,* 738 F.2d 487, 493 (D.C.1984).

Although the language of NEPA indicates that Congress was concerned with the global environment and the worldwide character of environmental problems, it does not explicitly provide that its requirements are to apply extraterritorially. The purpose of NEPA is to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment...." 42 U.S.C. § 4321 (emphasis added). The Act provides that all agencies of the federal government shall prepare EIS's for major federal actions "affecting the quality of the human environment." 42 U.S.C. § 4332. NEPA, however, also requires federal agencies to "recognize the worldwide and long-range character of environmental problems." 42 U.S.C. § 4332(F). The Act clearly recognizes, however, that actions should be taken "consistent with the foreign policy of the United States." *Id.*

Plaintiffs cite to portions of the Congressional Record in an effort to persuade this court that Congress' intent was that NEPA be applied to environmental impacts abroad. This court is convinced that Congress intended to *encourage* federal agencies to consider the global impact of domestic actions and *may* have intended under certain circumstances for NEPA to apply extraterritorially. However, as Judge Wilkey of the D.C. Circuit noted, "NEPA's legislative history illuminates nothing in regard to extraterritorial application." *NRDC v. NRC,* 647 F.2d at 1367.[10]

Hence, the court must determine whether Congress intended NEPA to apply under *circumstances such as these* and whether,

under the unique facts presented, defendants have violated NEPA by failing to prepare a comprehensive EIS for actions taken outside of the United States and within a foreign country pursuant to an executive commitment and in furtherance of a Congressional mandate.

■■■■ The court recognizes its ability and duty to interpret federal statutes and executive agreements. *Japan Whaling Ass'n v. American Cetacean Soc.,* 478 U.S. 221, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986). Similarly, the court acknowledges that the political question doctrine does not bar this court from addressing questions which may implicate national security issues. *See No GWEN Alliance v. Aldridge,* 855 F.2d 1380 (9th Cir.1988); *Romer v. Carlucci,* 847 F.2d 445 (8th Cir.1988). In deciding whether Congress intended NEPA to reach extraterritorially, however, the court *must* take into consideration the foreign policy implications of applying NEPA within a foreign nation's borders to affect decisions made by the President in a purely foreign policy matter. *See, e.g., Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 804 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *see also McCulloch v. Sociedad Nacional,* 372 U.S. 10, 83 S.Ct. 671, 677–678, 9 L.Ed.2d 547 (1963).

The removal of the stockpile from the FRG is an action undertaken by the United States Army and Department of Defense with the encouragement, cooperation and approval of the West German government.[11] As noted in *NRDC v. NRC,* 647 F.2d at 1356, "[t]his is not a case of the United States imperiously imposing its will on [a foreign country]." These obsolete

---

**10.** *NRDC v. NRC, id.,* is the only appellate decision which directly addresses the question of whether NEPA applies extraterritorially to require evaluation of environmental impacts solely within a foreign jurisdiction. The D.C. Circuit Court of Appeals held that NEPA did not apply to the Nuclear Regulatory Commission's decision to issue a nuclear export license for the exportation of nuclear reactor technology to the Philippines. *Id.* at 1366. Although the D.C. Circuit's decision was expressly limited to the specific facts presented there, this court draws guidance from the court's reasoning.

**11.** Although plaintiffs argue that the West German Army is only minimally involved in this operation, it is not necessary for this court to resolve the relative involvements of the two nations. Regardless of the extent of the West German Army's participation in the removal operation, the unrefuted evidence indicates that the FRG is supportive of the Army's action and has participated in, cooperated with, and encouraged the removal of these weapons.

munitions have been stored on West German soil since 1968 at the sufferance of the West German people and the President's commitment to the FRG to remove these munitions by the end of 1990 undoubtedly stemmed from diplomatic concerns which are clearly beyond the purview of this court's review.

As stated in this court's previous order denying plaintiffs' application for temporary restraining order, the court finds the D.C. Circuit Court of Appeals reasoning in *NRDC v. NRC* persuasive. *Id.* In that case, the court held NEPA did not require the preparation of an EIS for nuclear technology export decisions with respect to impacts which fall exclusively within a foreign jurisdiction. *Id.*

In the context of nuclear technology exports, the D.C. Circuit Court of Appeals considered that the extraterritorial application of United States regulatory laws might result in a conflict with or a displacement of the foreign sovereign's own regulations. *Id.* at 1356-7. The court recognized the potential for regulatory coercion where "the United States ... hold[s] the cards." *Id.* at 1357. The court also stated that NEPA

> ... looks toward cooperation, not unilateral action, in a manner consistent with our foreign policy. Moreover, if an EIS requirement attached to nuclear exports, there would be the spectre of litigation over the adequacy of the EIS, with delay the inevitable result.

*Id.* at 1366 (footnotes omitted).

Similar concerns are present here. An extraterritorial application of NEPA to the Army's action in the FRG with the approval and cooperation of the FRG would result in a lack of respect for the FRG's sovereignty, authority and control over actions taken within its borders. Although there is no question that the movement of the weapons is being effectuated in large measure by United States Army personnel to eliminate United States weapons, the removal operation takes place entirely within the FRG and the environmental impacts of the actual overland transportation of the stockpile are felt solely within that country. The West German government has reviewed and approved the operation. A West German court has denied a request for injunctive relief brought by West German citizens to halt the movement of the weapons, finding that the operation comported with and did not violate West German law. *See* Translation of the Decision of the Administrative Court of Cologne, July 20, 1990. Imposition of NEPA requirements to that operation would encroach on the jurisdiction of the FRG to implement a political decision which necessarily involved a delicate balancing of risks to the environment and the public and the ultimate goal of expeditiously ridding West Germany of obsolete unitary chemical munitions.

Other than the D.C. Circuit decision of *NRDC v. NRC*, 647 F.2d 1345, the court has found no other case which accentuates as sharply the necessity of balancing the environmental goals of NEPA against the particular foreign policy concerns which federal action abroad necessarily entails.[12] *Cf. Sierra Club v. Adams*, 578 F.2d 389 (D.C.Cir.1978) (Department of Transportation and Federal Highway Administration fulfilled NEPA requirements for construction of the Darien Gap Highway through Panama without contesting its application); *National Org'n for Reform of Marijuana Laws (NORML) v. U.S.*, 452 F.Supp. 1226 (D.C.1978) ("in view of defendants' willingness to prepare an 'environmental analysis' of the Mexico effects of United States support of that nation's narcotics eradication

---

**12.** The court also notes that the majority of the cases in which the issue of applying NEPA extraterritorially was raised pre-date Executive Order 12114, *discussed infra. See Sierra Club v. Adams*, 578 F.2d 389; *NORML*, 452 F.Supp. 1226. Executive Order 12114 requires federal agencies to evaluate the environmental impacts of their actions taken outside the territorial United States and to implement procedures to that effect. The order does not, however, require any environmental assessment of the impacts solely with the FRG since it only requires environmental evaluation of "major Federal actions significantly affecting the environment of a foreign nation *not participating with the United States and not otherwise involved in the action.*" Section 2-3(b) (emphasis added).

program, together with the EIS required by NEPA as to the impact of that program upon the United States, the Court need not reach the issue and need only assume without deciding, that NEPA is fully applicable to the Mexican herbicide spraying program"). It is perhaps precisely this potential conflict which caused Congress to leave open the question of whether NEPA applies to the environmental impacts of federal action abroad.

While the *destruction* of the European stockpile is mandated by Congress, the timing of the removal of the stockpile from West Germany has not been specifically addressed by Congress, but has been ordered by the President in the exercise of his foreign policy powers. The President's decision to remove these weapons from Europe by the end of 1990 does not conflict with the congressional mandate to destroy all obsolete chemical munitions by 1997, but rather implements Congress' decision and takes into consideration foreign policy and diplomatic concerns.

The essence of the President's commitment is timing. Although NEPA is clearly a procedural statute, its application to the foreign segment of the Army's action would interfere with the substance of the President's commitment. As previously indicated, the President's decision under the unique circumstances of this case involves foreign policy concerns which are beyond this court's review. Plaintiffs' assertion that application of NEPA to the defendants' action within West Germany would not substantively interfere with executive action ignores reality.

Based on existing precedent, the legislative history and the facts presented here, this court must conclude, absent a clear congressional intent to the contrary, that NEPA does not apply to the movement of munitions through and within West Germany. *See Commodity Futures Trading Comm'n*, 738 F.2d at 493. Such an application of NEPA to actions on foreign soil would result in grave foreign policy implications and would substantively interfere with a decision of the President and a for-

eign sovereign in a manner not intended or anticipated by Congress.

The court must emphasize that this decision is limited to the specific and unique facts which are presented here. In other circumstances, NEPA *may* require a federal agency to prepare an EIS for action taken abroad, especially where United States agency's action abroad has direct environmental impacts within this country, or where there has clearly been a total lack of environmental assessment by the federal agency or foreign country involved. *See Sierra Club v. Adams*, 578 F.2d 389, *NORML*, 452 F.Supp. at 1233. That is not the case here.

c. *Application of NEPA to the Global Commons*

 The foreign policy considerations which were critical to the preceding analysis of extraterritorial NEPA application are not implicated to the same extent by the transoceanic shipment of the European stockpile from West Germany to Johnston Atoll. The global commons portion of the Army's action does not take place within the sovereign borders of a foreign nation or in concert with that foreign nation. Accordingly, the question of NEPA application to the transoceanic shipment of the chemical munitions presents a different question.

In addition and in contrast to the intra-German portion of the operation, the Army did in fact prepare a written evaluation of the environmental impacts of the transoceanic shipment of the European stockpile, albeit in a separate document from the SSEIS. Defendants prepared a 142-page environmental assessment, the GCEA, dated March 1990.

The GCEA evaluates four potential sea routes for shipment of the munitions from the North Sea to the territorial waters extending 12 nautical miles from Johnston Atoll. It briefly discusses alternatives to ocean transport including no action, *in situ* destruction, and air transportation. GCEA at 73–74. The GCEA also discusses the effects of the transportation on water quality; air quality; the risks to threatened,

endangered and special interest species;[13] risks to commercial fisheries and to the human population. *Id.* at 81–84, 91–95, 98–102, and 104. The report analyzes and rates the four routes for their relative environmental risks and their risks to human life. *Id.* at 115.

The conclusion reached in the GCEA is that "[n]ormal operations of all routes would cause no significant impact on the environment of the global commons, assuming that none of the low probability accidents examined actually occur." Finding of No Significant Impact (FONSI), April 30, 1990. The FONSI also states that "[o]nly a complete loss of a vessel, uncontrollable ship fire, or large terrorist attack could result in some release of contaminants, but the probability of these events is very low."[14]

Defendants contend that Executive Order 12114 is the exclusive law governing evaluation of the environmental impacts of the global commons portion of the movement of the European stockpile. Executive Order 12114 provides, in part, as follows:

1–1. *Purpose and Scope.* The purpose of this Executive Order is to enable responsible officials of Federal agencies having ultimate responsibility for authorizing and approving actions encompassed by this Order to be informed of pertinent environmental considerations and to take such considerations into account, with other pertinent considerations of national policy, in making decisions regarding such actions. While based on independent authority, this Order furthers the purpose of the National

Environmental Policy Act ... consistent with the foreign policy and national security policy of the United States, and *represents the United States government's exclusive and complete determination of the procedural and other actions to be taken by Federal agencies to further the purpose of the National Environmental Policy Act, with respect to the environment outside the United States, its territories and possessions.* (Emphasis added.)

The Order requires the preparation of an EIS for "major Federal actions significantly affecting the environment of the global commons outside the jurisdiction of any nation (*e.g.,* the oceans or Antarctica)." Executive Order 12114, section 2–3(a).

The court cannot conclude, as defendants would suggest, that Executive Order 12114 preempts application of NEPA to *all* federal agency actions taken outside the United States. Such an application of an Executive Order would be inappropriate and not supported by law. *See, e.g., Independent Meat Packers Ass'n v. Butz,* 526 F.2d 228, 236 (8th Cir.1975), *cert. denied, Nat'l Ass'n of Meat Purveyors v. Butz,* 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976). Nevertheless, the court is persuaded under the *specific facts* of this case that the Army's compliance with Executive Order 12114 is to be given weight in determining whether NEPA requires defendants to consider the global commons portion of the removal of the European stockpile in the same EIS which covers the JACADS project.[15]

**13.** The GCEA analyzes and compares the risks the various routes will have on, among other species, the humpback whale, the green sea turtle, seals and sea lions.

**14.** The GCEA concludes that the risks of fire, ship loss and terrorist attack are not reasonably foreseeable with modern ships escorted by surface vessels and/or military airpatrol and operated by trained personnel. GCEA at 113–114. It is estimated that risk to human life due to a terrorist attack is extremely low since casualties could only occur if the terrorist incident occurred within 10 km of a populated coast, involved an armor-piercing high explosive penetrating the deck and munitions containers and the wind and weather conditions are such that

the released chemical drifts over populated areas. *Id.* The probability of all these events occurring simultaneously is estimated by the Army as being less than 1 in 500,000. *Id.*

**15.** Plaintiffs also contend that defendants have failed to comply with Executive Order 12114 as well as with NEPA by preparing an Environmental Assessment instead of a more extensive EIS. This argument is unpersuasive.

First, the Executive Order itself states that "nothing in this Order shall be construed to create a cause of action." Section 3–1. Furthermore, by its terms, the Order only requires an EIS for "major Federal actions *significantly affecting* the environment of the global commons outside the jurisdiction of any nation."

Plaintiffs make much of CEQ comments on the application of NEPA to federal actions abroad. The comments relied upon, however, preceded the issuance of Executive Order 12114 in 1979. Since that date, the CEQ's Tenth Annual Report indicates that the CEQ consulted extensively with the Department of State to assist the Carter administration in drafting an order which would approach the issue "in a way sensitive both to environmental and foreign policy concerns." "Environmental Quality—1979, The Tenth Annual Report of the Council on Environmental Quality" (December 1979) at 582 (footnotes omitted). The CEQ has also taken steps to implement that order. *See* CEQ, Environmental Effects Abroad of Major Federal Actions, Executive Order 12114, Implementing and Explanatory Documents, Memorandum for Heads of Agencies with International Activities, 44 Fed.Reg. 18722 (March 23, 1979).

The transoceanic movement of the munitions is a necessary consequence of the stockpile's removal from West Germany.[16] In that sense, it is a "connected activity" to both the removal of the weapons from West Germany *and* the ultimate disposal of the weapons at Johnston Atoll. *See* 40 C.F.R. § 1502. Nevertheless, the court finds the transoceanic shipment's relationship to the removal of the weapons from West Germany is compelling and hence, implicates many of the same foreign policy concerns which affect the movement of the weapons through West Germany and distinguish it from the actual incineration of the weapons at the JACADS facility.

These considerations, together with the Army's preparation of the GCEA pursuant to Executive Order 12114, compel this court to hold that defendants have not violated NEPA by failing to consider the transoceanic shipment of chemical munitions to Johnston Atoll in the same comprehensive EIS as the incineration of those munitions.[17]

### 2. Failure to Consider Alternative Actions

NEPA requires federal agencies to prepare a "detailed statement ... on ... alternatives to the proposed action...." 42 U.S.C. § 4332(2)(C)(iii). Agencies, however, "need only set forth those alterna-

---

*Id.* (emphasis added). Defendants determined through the preparation of the GCEA, that there would be no significant impact on the global commons and therefore did not prepare an EIS. This court has no standards to apply to Executive Order 12114. Plaintiffs insist on applying NEPA standards to Executive Order 12114 to require a "convincing statement of reasons" where an EIS is not prepared, *see The Steamboaters v. FERC,* 759 F.2d 1382, 1393 (9th Cir. 1985), however, there is no authority for applying that standard to an environmental assessment prepared pursuant to Executive Order 12114.

Moreover, after review of the GCEA, it appears to this court that the GCEA is thorough and sets forth convincing reasons to substantiate its finding of no significant impact.

**16.** Although the GCEA discussed alternative actions to transoceanic transportation, the record establishes that the FRG will not tolerate incineration of the stockpile within its borders and has no facilities to do so. The agreement between President Reagan and Chancellor Kohl affirms the United States obligation to remove the weapons from West Germany. Accordingly, destruction of the munitions in the FRG was not considered to be a viable option. In addition, continued storage would violate the Congressional mandates to destroy all unitary chemical

weapons. Air transportation was considered but not selected because of cost and because the risk of accidents would be greater than with ship movement. Therefore, transoceanic shipment, whether to Johnston Atoll or the continental United States, necessarily ensues as a result of the United States' commitment to remove the weapons from the FRG and destroy them.

**17.** In *NORML v. U.S.,* 452 F.Supp. at 1233, cited and relied upon by plaintiffs, the district court based its ruling in part on the federal defendants' "willingness to prepare an 'environmental analysis' of the Mexico effects of United States support of that nation's narcotics eradication program, together with the EIS required by NEPA as to the impact of that program upon the United States" in determining whether the defendants had violated NEPA. The court assumed but did not decide that NEPA was applicable to the United States' participation in a paraquat spraying program in Mexico, but found that the preparation of an "environmental analysis" on the effects outside of the United States, *i.e.,* in Mexico, would satisfy NEPA requirements. *Id.* In the instant case, defendants have prepared an environmental assessment with respect to the transoceanic shipment of munitions.

tives necessary to permit a 'reasoned choice.'" *Friends of Endangered Species v. Jantzen*, 760 F.2d 976, 988 (9th Cir.1985) (citations omitted). An agency is not required "to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved." *Vermont Yankee Nuclear Power v. Natural Resources Defense Council*, 435 U.S. 519, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978).

Plaintiffs assert that defendants have violated NEPA by failing to evaluate a full range of alternatives in the Final SSEIS covering the JACADS project. Specifically, plaintiffs contend that defendants avoided evaluation of the "no action" alternative by "improperly creat[ing] an 'agreement' with a December 1990 deadline." Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction at 15. Plaintiffs also contend that the Army failed to analyze alternative sites for disposal in the continental United States based on a misreading of Pub.L. 91–672.

Section 3.3 of the SSEIS addresses "Alternatives Eliminated from Detailed Consideration." SSEIS at 3–5. In that section, the Army discusses various alternatives to disposal at Johnston Atoll, including "no action," disposal or interim storage of the munitions at alternate disposal or storage facilities in the continental United States. The Army's viable alternatives for disposing of these lethal weapons are admittedly limited. The JACADS facility is currently the *only* incinerator of its kind capable of destroying the munitions in question.[18] In addition, transportation and handling of these munitions within the continental United States poses significant inherent risks which are discussed fully in the Final Programmatic EIS for the Chemical Stockpile Disposal Program.[19] Finally, as discussed previously, the Army is also compelled by Congress[20] and the President to prioritize the removal and destruction of the European stockpile.

Plaintiffs also submit the declaration of Dr. Wayne Landis, an expert in environmental toxicology who states that the SSEIS is inadequate because it fails to consider the alternative disposal method of biodegradation or the use of chemical catalysts, both of which he asserts are feasible alternatives to incineration. These options, though not discussed in the SSEIS, were documented and reviewed in the 1984 report prepared by the National Research Council, which confirmed the appropriateness of the Army's choice, and is referenced in the 1988 Chemical Stockpile Disposal Program Final Programmatic Environmental Impact Statement (CSDP FPEIS), which in turn is incorporated by reference in the SSEIS. Hence, the court cannot find, based on the Landis declaration, that the Army failed to consider a reasonable range of alternatives which might meet their goal. *See City of New York v. United States Department of Transportation*, 715 F.2d 732, 742 (2nd Cir.1983), *cert. denied* 465 U.S. 1055, 104 S.Ct. 1403, 79 L.Ed.2d 730 (1984).

The SSEIS does in fact consider numerous alternatives and explains in some detail the reasons that they are not viable. Defendants have adequately considered alternatives which would permit them to make a "reasoned choice." *Id.* NEPA does not

---

**18.** The SSEIS briefly discusses the proposed CONUS facilities. The alternative CONUS sites are not considered in detail however, due to their operational inability to destroy the specific munitions which comprise the European stockpile, their inadequate storage facilities, or the risks involved with the handling and overland movement of the stockpile to the various sites.

**19.** This EIS, prepared by the Army in 1988, led to the Army's decision to build chemical munitions disposal facilities at each of the eight CONUS sites to avoid transporting the munitions within the United States.

**20.** Defendants do not suggest that Pub.L. 91–672 is a direct ban on all shipments of chemical munitions to the continental United States. It is clear that Congress passed that law to specifically prohibit the Army from shipping the Okinawa stockpile to the continental United States. It equally clear, however, that the Okinawa stockpile was shipped to Johnston Atoll without Congressional interference. The Army relies on Pub.L. 91–672 only insofar as it demonstrates the political problem which would likely arise if it were to attempt to ship the European stockpile to storage facilities in the continental United States.

require them to give detailed consideration to alternatives which are not viable, or are remote or speculative. *Friends of Endangered Species*, 760 F.2d at 988; *see also City of New York*, 715 F.2d at 743 ("alternatives which could only be implemented after significant changes in government policy or legislation" *quoting Natural Resources Defense Council, Inc. v. Callaway*, 524 F.2d 79, 93 (2nd Cir.1975)). Accordingly, the court cannot find that the defendants' have violated NEPA for failing to consider a full range of alternatives in the SSEIS.

### 3. Failure to Supplement the Final SSEIS

■ "A federal agency has a continuing duty to gather and evaluate new information relevant to the environmental impact of its actions even after release of an EIS." *Enos v. Marsh*, 769 F.2d 1363, 1373 (9th Cir.1985). If "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," the defendants must supplement the EIS. 40 C.F.R. § 1502.9(c)(1).

■ Although an agency need not supplement an EIS every time new information comes to light after the EIS is finalized, if new information is submitted which shows that the remaining action will significantly affect the human environment in a manner not already considered, a supplemental EIS must be prepared. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 1859, 104 L.Ed.2d 377 (1989). Defendants' decision not to supplement the SSEIS, however, cannot be set aside unless it is "arbitrary or capricious." *Id.* 109 S.Ct. at 1861.

■ The plaintiffs' final NEPA claim is based on alleged "new information." In support of this "new information" however, they refer only to comments which they made to the SSEIS referring to "New Technologies" and the declaration of Dr. Landis, who states that he has done research in the area of biodegradation and neutralization which the Army has refused to consider.

Dr. Landis' information, as he admits, apparently is not "new" since it has been researched by and presented to the Army. *See* Landis Declaration ¶¶ 21, 22, and 23. This argument appears to be similar to the alternatives argument discussed above, and the court cannot find at this stage that it has merit.

Plaintiffs do not submit any convincing evidence or information which would allow this court to reasonably conclude that the Army abused its discretion and violated NEPA by failing to further supplement its EIS. Accordingly, the court, upon reviewing the 1983 Final EIS, the 1984 NRC report, the GCEA, and the SSEIS, and considering the special circumstances surrounding this case, cannot find that the Army's decision not to supplement the SSEIS is "arbitrary or capricious."

### C. *Claims Under Pub.L. 101–165 and International Law*

#### 1. Congressional Reporting Requirements

■ Plaintiffs' fourth claim for relief is based on the Army's alleged violation of the Department of Defense Appropriations Act, 1990, Pub.L. No. 101–165, Title VI, 103 Stat. 1112, 1127 which prohibits movement of any chemical munitions from their existing storage sites until the Secretary of Defense certifies to Congress that (1) "the Johnston Atoll Chemical Agent Disposal System ('JACADS') has destroyed live agent chemical munitions" and (2) "adequate storage capacity exists on Johnston Atoll to safely accommodate any chemical munitions or hazardous materials transported to that site."

Plaintiffs assert that the Army violated this Congressional reporting requirement because it certified to Congress that adequate storage capacity exists on Johnston Atoll to safely accommodate the chemical munitions which are now being transported, when such storage space does not exist *at this time.*

There is no legal precedent which would allow plaintiffs a private right of action to enforce a reporting provision of a Congressional appropriations bill. The D.C. Circuit

Court of Appeals has held that, despite the general presumption of reviewability of agency action, Congressional reporting requirements are not susceptible to judicial review. *National Resources Defense Council, Inc. v. Hodel* (*"NRDC v. Hodel"*), 865 F.2d 288, 317 (D.C.Cir.1988). There are no standards which this court could apply to these federal reporting requirements which are clearly aimed at defining relationships between Congress and the executive agencies and actions for which Congress approves funds. *Id.*

Plaintiffs assert that they have a private right of action under the APA, 5 U.S.C. § 706(2)(A). In *Japan Whaling Association*, 106 S.Ct. at 2866, n. 4, the United States Supreme Court held that private citizen groups could bring an action to enforce the Pelly and Packwood Amendments to the Fishermen's Protective Act of 1967, 22 U.S.C. § 1978, and the Magnuson Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq.* These amendments require the Secretary of Commerce to certify to the President when a foreign country directly or indirectly violates the whaling quotas set by the International Whaling Commission (IWC). *Id.* Upon certification, the Packwood Amendment requires the Secretary of State to impose sanctions on the foreign nation. 16 U.S.C. § 1821(e)(2)(B). In *Japan Whaling Association*, plaintiffs brought an action to force the Secretary of Commerce to certify to the President that Japan had violated the IWC quotas. 106 S.Ct. at 2865. The Supreme Court held that plaintiffs had met the requirements of standing under the APA. *Id.* at 2866, n. 4.

Clearly, the instant congressional reporting requirement in an appropriations bill is distinguishable from the certification requirement in *Japan Whaling Association*. Unlike the Secretary of Commerce's certification to the President under the Pelly and Packwood Amendments, the Army's report to Congress pursuant to the reporting requirement of Pub.L. 101–165 is a unique sort of agency action which is directly tied to Congress' appropriation of funds. *See NRDC v. Hodel*, 865 F.2d at 318. It does not involve the enforcement of an international treaty, or any other Act of Congress. It is, like numerous other similar congressional reporting requirements, "simply [a] reporting back to the source of [the agency's] delegated power in accordance with the Article I branch's instructions." *Id.*

The D.C. Circuit's reasoning in *NRDC v. Hodel, Id.*, which followed *Japan Whaling Association*, 106 S.Ct. 2860, is persuasive and directly on point:

> Lacking a provision for judicial review, the measure before us embodies a requirement that by its nature seems singularly committed to *congressional* discretion in measuring the fidelity of the Executive Branch actor to legislatively mandated requirements.... If the Secretary's response has indeed been deemed inadequate ... by its recipient, then it is most logically for the recipient of the report to make that judgment and take what it deems to be the appropriate action.... In short, in the absence of a congressional directive for judicial review of claims by non-congressional parties, this issue seems to us quintessentially within the province of the political branches to resolve as part of their ongoing relationships.

*Id.* at 318–319.

Furthermore, even if the court could review defendants' compliance with Pub.L. 101–165, it appears that defendants have adequately fulfilled the reporting requirement.[21] On July 22, 1990, the Army certified to Congress that live agent chemical munitions were destroyed at the JACADS facility on June 30, 1990, and between July 14 and July 21, 1990.[22] See Defendants'

---

21. Another critical problem with allowing judicial review of a congressional reporting requirement is the lack of judicially manageable standards for measuring the executive officer's response to the congressional mandate. *NRDC v. Hodel*, 865 F.2d at 319.

22. The court is not persuaded by plaintiffs' argument that Pub.L. 101–165 should be read together with the 1989 National Defense Authorization Act, Pub.L. 100–456 to require the army to complete a "prove out" period prior to moving the munitions. Section 118(b) of Pub.L. 100–456 provides as follows:

Exhibit 11. The Army also certified that "adequate storage capacity exists on Johnston Atoll to safely accommodate any chemical munitions or hazardous materials transported to that site." *Id.* In its SSEIS, and again at the hearing on plaintiffs' motion, the Army represented that safe storage facilities are and will be available for the European stockpile. Although plaintiffs disagree with the Army's determination of what safe and adequate storage capacity is, there is no authority or guidance under the cited congressional reporting provisions to find the Army abused its discretion in certifying to Congress that adequate storage capacity exists at Johnston Atoll.

### 2. International Law

Plaintiffs' fifth claim for relief alleges that defendants have violated the mandates of the Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and their Disposal ("Basel Convention") and the London Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter ("London Dumping Convention").

■ In the absence of authorizing legislation, an individual may enforce a treaty's provisions only when it is self-executing, that is, when it expressly or impliedly provides a private right of action. *Tel–Oren,* 726 F.2d at 808; *Handel v. Artukovic,* 601 F.Supp. 1421, 1425 (C.D.Cal.1985).

■ The Basel Convention has no implementing legislation and is not self-executing. This court has no standards or procedures to judicially enforce the treaty and therefore, plaintiffs' claim under the Basel Convention must fail. *See People of Saipan v. United States Dep't of Interior,* 502 F.2d 90, 97 (9th Cir.1974), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975).

... Until the Secretary of the Army successfully completes (through the prove-out work to be conducted at Johnston Atoll) operational verification of the technology to be used for the destruction of live chemical agents and munitions under this section, the Secretary may not conduct any activity for equipment prove out and systems test before live chemical agents are introduced at a facility (other

■ The London Dumping Convention, on the other hand, has been ratified and there is implementing legislation, the Marine Protection, Research, and Sanctuaries Act ("MPRSA"), 33 U.S.C. § 1401 *et seq.* Nevertheless, plaintiffs' claim under this treaty is misplaced since the London Dumping Convention is not applicable to on-land incineration. Article III(1)(a)(i) of the Convention prohibits "any deliberate disposal at sea of ashes or other matter from vessels, aircraft, platforms or other man-made structures at sea." Plaintiffs present no legal or factual support for their contention that Johnston Atoll, having been dredged and filled to increase its natural size, is a "platform" or "man-made structure" within the meaning of the London Convention. Johnston Atoll supports a territorial sea and an exclusive economic zone, claims which are limited to and are indicative of natural islands. Accordingly, the London Dumping Convention is inapplicable to the action at Johnston Atoll.

## IV. BALANCE OF HARDSHIPS

■ Finally, the court must turn to the relative balance of hardships of the parties in ultimately determining whether preliminary injunctive relief is warranted. This court discussed this issue extensively in its previous order denying plaintiffs' application for temporary restraining order and found that the balance of hardships did not tip sharply in favor of plaintiffs as to justify preliminary injunctive relief. Plaintiffs have not presented any additional convincing evidence or argument which would indicate that the balance of hardships now tips sharply in their favor.

There is no dispute that there are risks involved with the movement and destruction of the European stockpile. Every segment of the Army's action, however, has

than the Johnston Atoll facility) at which the destruction of chemical agent and munitions weapons is to take place under this section. This section is clearly unrelated to the reporting requirement for movement of the chemical weapons from storage contained in Pub.L. 101–165 and has no application to the Army's decision to move the weapons at this time.

received a "hard look." *See Kleppe v. Sierra Club*, 96 S.Ct. at 2739 n. 21. The Army has prepared three EIS's with respect to the JACADS facility on Johnston Atoll, including one specifically covering the disposal of the European stockpile. The Army also prepared an extensive environmental assessment, the GCEA, which addresses the environmental impacts of the transoceanic shipment of the weapons across the global commons. Finally, the West German government and court have reviewed and approved of the Army's transportation of the munitions within and through West Germany to the North Sea. Whether or not a comprehensive EIS is prepared, the speculative harm the plaintiffs complain of is inherent in any form of movement or even *in situ* destruction of the munitions.

In balancing the relative hardships, the court notes that plaintiffs waited until the removal of the European stockpile from West Germany was fully underway prior to commencing this action. Plaintiffs, however, were well aware of the impending movement of these weapons months before the actual shipment commenced. Although plaintiffs contend they could not commence this action until after July 23, 1990, when Notice of the Record of Decision was published, in light of the significant safety concerns that interrupting the movement of these weapons would pose, plaintiffs should not have delayed in the least in seeking injunctive relief.

As this court previously discussed, an injunction at this time would interrupt the defendants' carefully timed operation and require munitions to be left in temporary and less secure storage in Miesau or Nordenham. In addition, an injunction at this time may force a rescheduling of the detailed plans for movement and security, cause the Army to risk deteriorating weather conditions, and possibly subject the West German people and the environment to the risk of repeating this entire transportation process should plaintiffs' complaint prove unsuccessful. These factors as well as others previously discussed tip the balance of hardships in favor of defendants.

The court does not, nor can it, pass on the wisdom of the decision made by Congress and the President to remove the European stockpile from the FRG to Johnston Atoll. Under our constitutional form of government that is solely within the purview of the legislative and executive branches of government. The court's review at this point is limited only to whether the defendants have likely complied with the applicable statutes. Having found that defendants have fulfilled their obligations under NEPA as discussed above, and in light of the enhanced risks associated with halting the stockpile in transit the court is compelled to find that the balance of hardships tips in favor of denying the injunctive relief requested at this time.

## V. CONCLUSION

Therefore, for the reasons set forth above, plaintiffs' motion for preliminary injunction is DENIED.

IT IS SO ORDERED.